UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x

INVENTIO AG,

        Plaintiff,

   -against-                     06 Civ. 5377 (CM)

OTIS ELEVATOR CO.,

        Defendant.

----------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/23/11

## RULINGS ON MOTIONS IN LIMINE

McMahon, J.:

      The court, for its rulings on the parties' motions *in limine*:

**Plaintiff's Motions**

1.    Plaintiff's motion for judgment on the pleadings on Otis' Counterclaim for inequitable conduct has already been denied. It is not a proper motion *in limine*. The court is aware of the new decision of the Federal Circuit and will apply it to the evidence introduced at trial.

2.    Plaintiff's motion to bifurcate Otis' inequitable conduct counterclaim from the jury trial is denied. I will not be using an advisory jury. I will (obviously) listen to the evidence that the jury hears; to the extent there is overlap, I will not need to hear it again. I will hear any additional evidence that is pertinent only to inequitable while the jury is deliberating on the issues that are properly its to decide. At the close of that presentation, I will hand down a prompt opinion – probably by ticking off items from the proposed findings of fact and conclusions of law that the parties must submit (with citations to the evidence supporting them) by June 24. I generally do this orally from the bench. There will be no post-trial briefing, so the findings of fact and conclusions of law should be thorough and complete.

3.    Plaintiff's motion to bar defendant's expert, Robert Yerman, from testifying regarding reasonable royalty damages is denied, for substantially the reasons set forth by Otis in its memorandum of law.

4.    Plaintiff's motion to exclude the opinion of Daniel Van de Weide concerning invalidity is denied. The motion's description of Dr. Van de Weide's report, including his purportedly "conclusory" opinions, bears little resemblance to the actual report submitted to the court, which includes extensive analysis of the various items of prior art and reasons why they teach aspects

of what is purportedly novel and unique about the '094 patent, with citations to various aspects/claims of the purported prior art. The fact that Dr. Van de Weide created summary charts out of this analysis (after engaging in page after page of discussion) does not render his opinions "vague" or "conclusory," which would have violated the disclosure requirements set forth in Innogenetics, N.V. v. Abbott Labs, 512 F.3d 1363, 1373 (Fed. Cir. 2008).

5.      Plaintiff's motion to preclude any testimony from Otis' expert, Daniel Van der Weide, that is contrary to the court's claim construction is superfluous. Dr. Van der Weide is bound by the court's claim construction, as modified by the Federal Circuit. The jury will be instructed, at the beginning and at the end of the case, that it is bound by the claim construction, and that it must reject any testimony that is inconsistent with the claim construction or that suggests that the construction is wrong or needs to be modified. Plaintiff is free to cross examine any witness to insure that his testimony is consistent with the claim construction and to point out any inconsistency during closing arguments. Counsel can also move to quash or request a special instruction to the jury if they believe that testimony inconsistent with the claim construction was submitted.

6.      Plaintiff's motion to exclude the introduction of prior court opinions, reexamination papers and related evidence and argument is denied. The PTO's reexamination order will also be admitted. These items are highly relevant to the issue of objective recklessness.

7.      Plaintiff's motion to exclude Otis' proposed patent law expert, John Goolkasian, from testifying on the meaning of objective willfulness is granted. I do not allow lawyers other than myself to explain the law to the jury, no matter their credentials. Otis can submit proposed jury instructions and I will consider them; Mr. Goolkasian can of course help Otis craft jury instructions. But in my courtroom, no one testifies about the law, and no one interprets my opinions for the jury. If anyone wants an opinion interpreted for the jury, he should ask for a jury instruction.

Nor can Mr. Goolkasian testify as an expert that Inventio's failure to move for a preliminary injunction would signal to Otis that even the patent holder does not assess there to be an objectively high likelihood of infringement. Otis can argue to the jurors that they can consider that fact (i.e., the fact of failure to move for injunctive relief) as some evidence of Inventio's state of mind. But Otis cannot elicit – from its own "attorney expert," no less – what "must have been" Inventio's state of mind when it did or did not take this or that action in connection with this lawsuit. If Mr. Goolkasian gave Otis legal advice about the risk of infringement and the validity of the patent, Otis can waive the privilege and elicit that testimony (subject to all the usual caveats about the dangers of waiving privilege). Otherwise, his testimony is barred.

**Defendant's Motions**

1.      Defendant's motion to exclude the expert testimony of Dr. Eric Dowling on the knowledge of prior art authors is granted in part. Dr. Dowling may most certainly testify about the scope and content of prior art. He may not, however, opine about whether particular individuals were aware of that prior art. The court will advise the jurors about the rule that a

person "skilled in the art" is a hypothetical person who is presumed to be aware of all pertinent prior art.

2.      Defendant's motion to exclude the proposed expert testimony of Dr. Eric Dowling on active inducement of infringement is granted. Dr. Dowling has no particular expertise to bring to bear on the issue of whether Otis "actively induced" others to infringe. The material that is summarized by Dr. Dowling will be introduced into evidence, and the jurors, unaided by any expert, will decide whether Otis' conduct qualifies as "active inducement." Dr. Dowling's testimony is not required to help the jury understand the "meaning" of the underlying evidence.

3.      Defendant's motion to exclude the proposed expert testimony of Dr. Eric Dowling on secondary indicia of non-obviousness is granted, as plaintiff concedes that its technical expert cannot give expert testimony about commercial matters.

4.      Defendant's motion to exclude the proposed expert testimony of attorney Harry Manbeck is granted, for the same reason that plaintiff's corresponding motion to exclude the testimony of attorney John Goolkasian was granted. I understand that plaintiff has withdrawn Manbeck as a proposed witness in any event.

5. Defendant's motion to exclude the proposed expert testimony of Dr. Russell Mangum entirely is denied. Dr. Mangum's credentials and history as a mainstream economist are unimpeachable, and Otis' arguments all go to the weight of the evidence on which he relies. I personally see some problems with Dr. Mangum's analysis that can be highlighted to the jury, but I do not believe that it runs afoul of Uniloc USA, Inc., v. Microsoft, 632 F.3d 1292 (Fed. Cir. 2011). His "arbitrary starting point" for the calculation of a reasonable royalty is not, as Otis alleges, completely untethered from the facts of this case; rather, it was selected because it is the rate at which Schindler at one point licensed its intellectual property (including the '094 patent) to plaintiff Inventio. This license is, admittedly, as related company, but that does not "untether" the license from the "facts of the case" – it simply goes to the weight or lack of weight that the trier of fact might wish to accord the license data. Neither is Dr. Mangum's selection of a maximum possible license value "untethered" from the facts of this case; rather, the figure is his calculation of Otis' profit on the sales that allegedly infringe the '094 patent. The notion that Otis would be willing to pay a royalty that would wipe out its entire profit (assuming that profit has been correctly calculated) is of course worthy of some pointed cross examination; but Dr. Mangum's upper bound of reasonableness cannot be said to be unrelated to the facts of this case.

The 25% rule of thumb that was disallowed in Uniloc was, in contrast to the situation at bar, a rule that courts and experts had applied willy nilly in myriad cases without the slightest regard to the underlying facts – it was, as I understand it, a rule that was deemed to apply regardless of the facts, to all cases. I do not read Uniloc to do anything more than get rid of the notion that there is some absolute "rule of thumb" that can be applied to calculate a reasonable royalty without taking into account facts relating to the patent in suit.

The fact that Dr. Mangum applied the Georgia Pacific factors to the midpoint between the rate in the Schindler/Inventio license and the presumed profit of Otis is yet another

methodological decision that can be attacked, on cross or through the testimony of Otis' own expert – but it cannot fairly be analogized to what was deemed improper in Uniloc.

   6. Otis makes another motion addressed to Dr. Mangum's testimony – it seeks to preclude plaintiff from proving reasonable royalty damages that are calculated using the "entire market value rule," on which Dr. Mangum plainly relied. This motion is granted, because Dr. Mangum's analysis runs afoul of the Federal Circuit's decision in Lucent Technologies v. Gateway, Inc., 580 F.3d 1301, 1336 (Fed. Cir. 2009).

   In Lucent, the Federal Circuit announced that its jurisprudence on the entire market value rule – pursuant to which a patentee assesses damages based on the entire market value of the accused product – was "quite clear. For the entire market value rule to apply, the patentee must prove that, 'the patent-related feature is "the basis for customer demand."'" Id. Citing a Civil War era Supreme Court case about the McCormick reaper (Seymour v. McCormick, 57 U.S. 480, 491 (1853), and quoting a venerable precedent more than a century old, Garretson v. Clark, 111 U.S. 12, 121 (1884), the Court of Appeals noted that a patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative. . . . He must show . . . that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." [1]

   In Uniloc, the Federal Circuit warned against the danger of admitting consideration of the entire market value of the accused product where the patented component does not create the basis for customer demand. It is, therefore, important to give a motion to bar calculation of a reasonable royalty using the rule serious consideration. However, the court sitting on a motion *in limine* is not the trier of fact, and cannot arrogate the jury's function as trier of fact – even when ruling on a Daubert motion. If the patentee proffers *competent* evidence in opposition to the motion *in limine* that, if believed, would permit the jury to conclude that customer demand was a function of the patented feature, the expert testimony should not be disallowed.

---

[1] In Uniloc, the Federal Circuit can fairly be said to have obfuscated this "quite clear" rule a bit, by stating that the entire market value rule applies only where the patented feature (1) creates the basis for customer demand or (2) substantially creates the value of the component parts. To my knowledge, Formulation (2) does not appear in prior case law (and certainly not in prior Supreme Court case law). However, I understand the Federal Circuit to have been paraphrasing (inaccurately) Chief Judge Rader's articulation of what it means for a patented component to be "the basis for customer demand" of a product that contains both patented and non-patented elements. IP Innovation v. Red Hat, Inc., 705 F. Supp. 2d 687, 689 (E.D.Tex. 2010)(Rader, C.J., sitting by designation). In any event Dr. Mangum does not purport to base his opinion on whether the patented destination dispatching feature "substantially creates the value of the component part;" rather, he opines that damages should be based on the entire market value of an (allegedly) infringing Otis elevator installation because that feature is a "substantial basis for demand" for the entire elevator installation at the seven accused installations. (Ex. 11). Of course, "substantial basis for demand" appears nowhere in the jurisprudence as a test for ascertaining the use of the entire market value rule.

I emphasize the word "competent" for a reason: to get the expert's testimony to the jury, his evidence must comport with what seems to me a rather exacting standard. It is not enough to present evidence that the patented feature was desirable, or that it played some role – even a substantial role – in the customer's decision to purchase a system containing the infringing product. If the patented aspect of a system containing both patented and unpatented elements creates a "substantial basis for demand," that would tend to support the reasonableness of a higher royalty rate. But as long as other features of a product contributed to the customer's decision, Supreme Court precedent (which the Federal Circuit is powerless to overrule) demands that there be an apportionment of the defendant's profits and the patentee's damages between the patented feature and the various unpatentended features of the "whole machine" (in this case, the entire elevator installation).

So it seems to me, my role is to see if the patentee has proffered some credible evidence that customer demand for an entire elevator system was based on one aspect of that system – which, in this case, plaintiff's own expert (Dr. Mangum) identifies as a "novel elevator dispatch system" – rather than on other factors, including the vendor's history, reliability, price or ability to get the job done in a timely fashion. In order to be "competent," Inventio's evidence must suggest a "sound economic connection;" the Chief Judge of the Federal Circuit has suggested the use of econometric studies, customer surveys, regression analysis or other *marketplace-wide* evidence of demand sensitivities to satisfy this requirement. Cornell Univ. v. Hewlett-Packard Co., 2008 WL 2222189, at *3. Inventio has the burden of establishing that the entire market value rule applies. IP Innovation v. Red Hat, Inc., 705 F. Supp. 2d 687, 690 (E.D.Tex. 2010)(Rader, C.J., sitting by designation).

I asked Inventio to provide me with the evidence that led Dr. Mangum to conclude that customer demand for the Compass Elevator with Seamless Entry system was driven by the seamless entry system. Having reviewed this evidence, I conclude that it establishes that "seamless entry" destination dispatching was indeed a desirable feature, and that Otis would have placed itself at a competitive disadvantage if it did not incorporate a destination dispatching feature into its elevator products. However, the evidence does not provide a sound economic connection between the product's desirability and any contention that Compass with Seamless Entry (the allegedly infringing product) was *the* basis for public demand for an Otis (or any other manufacturer's) elevator system. The mere fact that customers at the seven allegedly infringing installations elected to purchase an elevator system with seamless destination dispatching does not, without more, establish that the system's entire value derived from that single feature, and Inventio proffers no competent evidence – indeed, no evidence at all – that it was. Therefore, I cannot allow Dr. Mangum to base his damages estimate on the entire market value of the elevator installation.

None of the evidence provided to the court includes any sort of statistical or regression analysis. None of it consists of customer surveys or even interviews asking Otis's seven customers why they selected Otis to provide their elevator installations.

The closest thing to actual customer data that appears in these documents is data about projects won and lost compiled by Otis. Of paramount interest is a list of projects utilizing

Compass on which Otis bid, together with their status at the time the exhibit was created (sold, lost, pending), and an indication of whether the customer was interested in destination dispatching. Some of these projects are overseas; some are recognizably in the United States, based on the listed address. Looking only at US installations (PX 96, Otis 005607-08), Otis' records show that it (1) lost some projects where the client wanted destination dispatching along with Compass (1 Bryant Park, 1211 Avenue of the Americas, 333 Market Street, and several others), (2) won some projects where the customer did not want destination dispatching along with Compass (1100 Biscayne Blvd., 717 North Harwood, 55 West Wacker), (3) lost some projects in which the customer did not want destination dispatching (One Art Plaza, Trump), and (4) won some projects in which the customer did want destination dispatching (111 Pine Street, AON).

It thus appears that customer demand for Otis elevator systems is idiosyncratic and not necessarily tied to the presence or absence of Compass with Seamless Entry. While one can assume that those who wanted the feature found it desirable and were willing to pay for it (with the exception of Larry Silverstein, about whom more below), there is no way of knowing (short of interviewing the customers, which was never done) whether this feature alone drove the decision to purchase from Otis – or, put otherwise, whether the presence or absence of the allegedly infringing feature "was of such paramount importance that it substantially created the value of the component parts" (i.e., of the entire elevator system). IP Innovation v. Red Hat, Inc., 705 F. Supp. 2d 687, 689 (E.D. Tex. 2010) (Rader, C.J., sitting by designation). Indeed, other documents attached to plaintiff's submission, which summarize customer feedback on lost bids, indicate that customers made their decisions based on multiple factors, including cost (PX 97, Otis 001585), Otis's inability to support a "swing car with independent riser" (Id. at 001586), lack of owner interface (Id.), and its lack of ability to demonstrate a functioning destination dispatching system with a track record in an occupied building (Id. at 001585, see also 001587-001589). Dr Mangum himself testified at his deposition that numerous factors contribute to Otis' elevator sales; so, ironically, did the director of Schindler's high rise business. (Ex. 11 and 13 to the In Limine Motion).

The rest of the documentary evidence, viewed most favorably to plaintiff, tends to show that (1) Otis was advised by a former employee (PX 52) that customers were becoming interested in destination dispatching of elevators, and that it needed to offer such a product as an option; (2) Schindler and other Otis competitors, including specifically Thyssen and Kone, had developed or were developing such systems and were thought to be at a competitive advantage as a result; (3) Otis added Compass with Seamless Entry to its existing contract for the elevator installation at 7 WTC because the customer (Larry Silverstein) insisted on it, to the point of suggesting that the failure to provide it would negatively affect Otis' effort to win the elevator contract for the Freedom Tower (1WTC) – even though Otis did not believe that the lobby at 7 WTC was ideally configured for the product.

Dr. Mangum testified that he relies heavily on this last factor – the WTC situation – to support his opinion about the demand for the patented technology, claiming at it was "imperative" to the owner." (Ex. 11). I confess that I have some problem with Dr. Mangum's selective reliance on information about 7 WTC; he apparently relies on it when he finds it helpful to Inventio's argument (Larry Silverstein demanded that this feature be added to his installation,

so it supports the use of the entire market value rule), but not when it undercuts Inventio's position (Larry Silverstein also demanded that Otis eat the rather substantial cost of this particular change order, which skewed the price of the installation lower and substantially cut into Otis' profit on the project, so it was an "artificial" price that must be backed out of the actual calculation of a reasonable royalty). I really don't think plaintiff can have it both ways.

However, it is undisputed that Otis was awarded the 7 WTC contract for a conventional elevator system without Compass with Seamless Entry, which suggests that there was value to the customer in Otis' system even without destination dispatching, and so undercuts the suggestion that reliance on the entire market value rule is appropriate. Furthermore, there is no evidence in the record that Silverstein was prepared to break his existing contract with Otis and go with Schindler or any other supplier at 7 WTC if he could not get destination dispatching from Otis – again indicating that there were other aspects of Otis' offering that had value to him.[2]

Finally, Dr. Mangum appears to have used the wrong standard. He opines that the patented feature was a "substantial basis for demand" at the seven accused installations. But the test, as articulated by Chief Judge Rader, is whether the patented component was of such paramount importance that it substantially created the value of the component parts – thereby making it "*the* basis for customer demand." IP Innovation, *supra*. By articulating the wrong standard, Dr. Mangum's use of the entire market value rule to calculate damages is independently flawed and cannot be presented to the trier of fact. Cornell Univ. v. Hewlett-Packard Co., No. 01 Civ 1974, 2008 WL 2222189, at *1 (N.D.N.Y., May 27, 2008) (Rader, C.J., sitting by designation). We know what Chief Judge Rader meant by having a patented invention that consisted of a component part of a system be "the basis for demand" of the system, because he explained exactly what he meant in IP Innovations. Unfortunately, the standard articulated by Chief Judge Rader is not the standard that Dr. Mangum applied.

Therefore, Otis' Motion *In Limine* No. 6 is granted, and Inventio will not be permitted to claim that its royalty should be calculated using the entire market value rule.


7.     Defendant's motion to preclude plaintiff's witnesses from "serving as conduits for hearsay opinions of non-testifying experts" is denied. This represents yet another improper use of *in limine* motions. I cannot possibly rule on hearsay objections in this manner. The proper thing to do is to object during trial when an objectionable question is asked. I note, however, that when experts rely on the opinion of other experts, the evidence comes in as allow the jury to assess the basis for the testifying expert's opinion.

8.     Defendant's motion to exclude the proposed expert testimony of James Fortune is denied as moot, since plaintiff is not planning to call the witness. Mr. Fortune would never be allowed to offer an opinion about the existence of a "conspiracy" in any event. Nor would he be permitted to testify about matters of claim construction. All claims will be construed for the jury by the court. Any claim as to which disputed claim terms were not submitted for determination at the Markman hearing must have an agreed upon construction.

---

[2] I look in vain for evidence about the basis for demand at the other six installations.

9.     Defendant's motion to exclude PX 60 and PX 100 and related testimony is denied.

10.    Defendant's motion to preclude plaintiff from using Schindler marketing material and press releases is denied, although press releases will be admitted only for the limited purpose of showing marketing strategies.

11.    Defendant's motion to preclude plaintiff from using evidence regarding infringement under the doctrine of equivalents is yet another example of the misuse of *in limine* motions. This is, in essence, a motion for summary judgment. I will not entertain such a motion in the guise of an *in limine* motion. The parties have had ample time since remand to advise the court about the need for additional motions for summary judgment. This issue was known at the time Otis moved for summary judgment on the issue of non-infringement in May 2010. It was also referenced in Inventio's response to that motion. Otis chose not to grapple with the issue then. It is too late now. To the extent that there are issues of law to be dealt with it will be done on a JMOL motion that is properly briefed with references to the relevant evidence – not on a motion *in limine* to preclude evidence.

12.    Defendant's motion to exclude the testimony of plaintiff's "undisclosed witnesses" is denied.

This constitutes the decision and order of the court.

June 22, 2011

_____
U.S.D.J.

BY ECF TO ALL COUNSEL